# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Respondent** | ) |
| | ) |
| **vs.** | ) **Crim. No. 99-215** |
| | ) **(Civil Action No. 06-212)** |
| **JOSEPH P. MINERD,** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION

Pending before the Court is Petitioner Joseph P. Minerd's *pro se* "Motion Under 28

U.S.C. to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody" ("Section 2255

Motion") [ECF #453]. In Support of his Motion, Petitioner filed a "Memorandum in Support of

Defendant's Motion Under 28 U.S.C. to Vacate, Set Aside or Correct Sentence by a Person in

Federal Custody" ("Supporting Memorandum") [ECF #454]. In response, the Government filed

"Government's Response to Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or

Correct Sentence" ("Government's Response") [ECF #462]. Petitioner then filed "Petitioner's

Traverse in Response of Government's Answer to Petitioner's 28 U.S.C. § 2255." [ECF #465]

("Traverse"). For the reasons stated below we will deny Petitioner's "Motion Under 28 U.S.C. to

Vacate, Set Aside or Correct Sentence by a Person in Federal Custody."

1

## I. Background.

Petitioner Joseph P. Minerd was convicted by a jury on May 17, 2002 of one count of maliciously destroying property by means of fire and explosives in violation of 18 U.S.C. § 844(i). Petitioner had placed gasoline and a pipe bomb in the townhouse of Deanna Mitts ("Ms. Mitts"). The pipe bomb ultimately deflagrated and caused a fire. Ms. Mitts, who was pregnant at the time of her death, and her daughter, Kayla, were home at the time the bomb deflagrated and died as a result of the explosion/fire that ensued.

Ultimately, the jury deadlocked on the issue of whether Petitioner should be sentenced to death or life without parole for the crime he committed. This Court then sentenced Petitioner on August 8, 2002 to life in prison without possibility of parole. On August 19, 2002, Petitioner appealed his conviction and sentence to the United States Court of Appeals for the Third Circuit. On direct appeal, the appellate court affirmed his judgment of conviction and sentence. United States v. Minerd, 112 Fed. Appx. 841 (3d Cir. 2004). Petitioner then appealed to the United States Supreme Court. On March 14, 2005, the Supreme Court denied Petitioner's petition for certiorari and Petitioner timely filed the instant Motion.

## II. Applicable Law.

In his Motion, Memorandum, and Traverse, Petitioner contends that he received ineffective assistance of counsel at both the trial stage and the appellate stage of the proceedings against him. Therefore, Petitioner argues, he is entitled to relief pursuant to 28 U.S.C. § 2255 ("Section 2255" or "§ 2255").

Section 2255 provides a means of collaterally attacking a sentence imposed after a conviction. United States v. Cannistraro, 734 F. Supp. 1110, 1119 (D. N.J. 1989), aff'd, 919 F.2d

2

133 and 919 F.2d 137 (3d Cir. 1990), cert. denied, 500 U.S. 916 (1991). Pursuant to § 2255, a federal prisoner may move the sentencing court to vacate, set aside or correct a sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. Relief under this provision is "generally available only in 'exceptional circumstances' to protect against a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." United States v. Gordon, 979 F. Supp. 337, 339 (E.D. Pa. 1997) (citing Hill v. United States, 368 U.S. 424, 428 (1962)).

When presented with a Section 2255 motion, the Court must consider the motion together with all the files, records, transcripts and correspondence relating to the judgment under attack. See 28 U.S.C. § 2255; Rule 4(b). Significantly, a district court considering a § 2255 motion "'must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record,'" United States v. Booth, 432 F.3d 542, 545 (3d Cir.2005) (quoting Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir.1989)), and a court "abuses its discretion if it fails to hold an evidentiary hearing when the files and records of the case are inconclusive as to whether the movant is entitled to relief." Booth, 432 F.3d at 546 (citing United States v. McCoy, 410 F.3d 124, 134 (3d Cir.2005). However, the final disposition of a § 2255 motion lies with the discretion of the trial judge, see Virgin Islands v. Nicholas, 759 F.2d 1073, 1075 (3d Cir.1985), and a district court may summarily dismiss a § 2255 motion where the motion, files, and records "show conclusively that the movant is not entitled to relief." U.S. v. Mason, 2008 WL 938784, 1

3

(E.D. Pa. 2008), citing Forte, 865 F.2d at 62.

"Section 2255 generally may not be employed to relitigate questions which were raised and considered on direct appeal." United States v. DeRewal, 10 F.3d 100, 105 n. 4 (3d Cir. 1993) (internal quotations omitted). Moreover, "if a petitioner has failed to raise an objection at the time of trial and has also failed to raise the issue on direct appeal, then collateral review of that claim is procedurally barred unless the petitioner is able to show 'cause' excusing his procedural default and 'actual prejudice' resulting from the alleged error or violation." Henry v. United States, 913 F. Supp. 334, 335 (M.D.Pa.1996), aff'd, 96 F.3d 1435 (3d Cir.1996); see also United States v. Essig, 10 F.3d 968, 979 (3d Cir.1993) (holding that the "cause and prejudice" standard set forth in United States v. Frady, 456 U.S. 152 (1982) "applies to § 2255 proceedings in which a petitioner seeks relief from alleged errors in connection with his sentence that he has not directly appealed"). A petitioner need not, however, demonstrate cause and prejudice when raising a claim of ineffective assistance of counsel for the first time in a collateral attack. DeRewal, 10 F.3d at 104.

"A claim of ineffective assistance [of counsel] requires a defendant to establish that counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant." McAleese v. Mazurkiewicz, 1 F.3d 159, 166 (3d Cir. 1993), citing Strickland v. Washington, 466 U.S. 668, 687-688, 104 S.Ct. 2052 (1984). In assessing the first prong, the Supreme Court has instructed that "[t]he proper measure of attorney performance" is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. This is an objective standard, and must be "viewed to the extent possible without 'the distorting effects of hindsight.'" Duncan v. Morton, 256 F.3d 189, 200 (3d Cir. 2001) (quoting

4

Strickland, 466 U.S. at 688-90). In addition, a "reviewing court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" McAleese, 1 F.3d at 175 (quoting Strickland, 466 U.S. at 692). "The defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial [or appellate] strategy.'" Strickland, 466 U.S. at 689.

Addressing the second part of the Strickland analysis, the prejudice prong, "[t]o establish prejudice, a defendant must demonstrate that there is a 'reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Weeks v. Snyder, 219 F.3d 245, 257 (3d Cir. 2000) (quoting Strickland, 466 U.S. at 694). The Supreme Court has further explained that a "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." Id. at 694. In making the prejudice determination, the court must consider the totality of the evidence. Id. at 695. When ruling on a §2255 petition, the court may address the prejudice prong first "and reject an ineffectiveness claim solely on the ground that the defendant was not prejudiced." Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir. 2006).

Additionally, and critically, a claim of ineffective assistance must identify the specific error(s) counsel has made. Conclusory allegations are not sufficient to support a petition/motion under Section 2255. Blackledge v. Allison, 431 U.S. 63, 74 (1977). See also U.S. v. Thomas, 221 F.3d 430, 437 (3d Cir. 2000) (citing U.S. v. Dawson, 857 F.2d 923, 928 (3d Cir. 1988) (reiterating that "vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court."); Zettlemoyer v. Fulcomer, 923 F.2d 284, 298 (3d Cir. 1991) (a petitioner "cannot meet his burden to show that counsel made errors so serious that his representation fell below an objective standard of reasonableness based

on vague and conclusory allegations that some unspecified and speculative testimony might have established his defense. Rather, he must set forth facts to support his contention.") (citation omitted).

Finally, a *pro se* pleading is held to less stringent standards than pleadings drafted by attorneys. Estelle v. Gamble, 429 U.S. 97, 106, 97, 97 S.Ct. 285 (1976); Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594 (1972). Thus, a *pro se* habeas petition should be construed liberally. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir.1998). We consider Petitioner's Section 2255 Motion according to these standards.

## III. Need for an Evidentiary Hearing.

When a Motion is made pursuant to 28 U.S.C. § 2255, the Court must make a determination as to whether an evidentiary hearing is required. Where the Record affirmatively indicates that a Petitioner's claim for relief is without merit, the claim may be decided on the record without a hearing. See Government of Virgin Islands v. Nicholas, 759 F.2d 1073, 1075 (3d Cir. 1985); Page v. United States, 462 F.2d 932, 933 (3d Cir. 1972). Thus, if the Record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted in support of a § 2255 motion, or if the movant would not be entitled to relief as a matter of law even if the factual predicates as alleged in the motion are true, it is not an abuse of discretion to elect not to conduct an evidentiary hearing. See Nicholas, 759 F.2d at 1075.

In this case, the Court finds, for the reasons set forth below in this Opinion, that the Record in this case, along with the Court's personal knowledge, affirmatively establishes as a matter of law that Petitioner's claims for relief are meritless. Therefore, an evidentiary hearing is not needed to dispose of Petitioner's § 2255 Motion.

6

**IV. Legal Analysis of Petitioner's Ineffective Assistance of Counsel Claims.**

Viewed broadly, Petitioner's Section 2255 Motion is premised upon the contention that both his trial and appellate counsel rendered ineffective assistance of counsel by failing to investigate and pursue pre-trial, and by not arguing pre-trial, during the trial and/or post-trial to the courts and the jury that the cause of the explosion and fire that killed the Mitts family was an accidental, natural gas explosion, and not a pipe bomb. Petitioner's contention that the explosion and subsequent fire was caused by a natural gas explosion, and not a pipe bomb, stems from the original conclusion of Trooper William Large, the fire marshal for the Pennsylvania State Police. "Trooper Large originally had investigated the cause and origin of the fire and had concluded on his Fire Investigation Report/Worksheet, dated January 14, 1999, that: "[i]t is my opinion that this explosion/fire was the result of a natural gas leak. It is not known at this time what ignited the explosion/fire." Exhibit D to Supporting Memorandum.

Essentially, it is Petitioner's contention that had his trial and appellate counsel advocated an accidental natural gas explosion explanation for the events that occurred on January 1, 1999, it would have been clear that the explosion and subsequent fire that killed the Mitts family was caused by a natural gas explosion, and not a pipe bomb, and he would not have been convicted. Petitioner supports his natural gas explosion theory with a number of documents which he has attached to his Supporting Memorandum and Traverse.

These documents, which forthwith we will refer to collectively as "Petitioner's Supporting Exhibits," are the following. First, of course, is Trooper Large's Fire Investigation Report/Worksheet, dated January 14, 1999. See Id.

7

Additionally, Petitioner cites to blueprints of the Rose Square Apartments where Ms.

Mitts' townhouse was located. See Exhibit H to Supporting Memorandum. Petitioner contends

the "Mechanical drawing reveals locations of each drain within structure along with water heater.

These drawings reveal the use of 2" diameter pipe inside this structure." Traverse, p. 3.

Petitioner also cites to specifications for the Rose Square Apartments. See Exhibit I to

Supporting Memorandum. In particular, Petitioner cites to 2 sections in Division 15A of the

specifications. Traverse, pp. 3-4 (citing Exhibit I to Supporting Memorandum, Division 15A

Plumbing, 15A-4 and 15A-6). First, he cites to 15A-4 where it is stated for the "Washing

Machine Supply and Drain Unit," to "furnish and install where shown, 43" above floor, a

recessed washing machine connection box, "Guy Gray WB-200" or approved equal with ½"

supply feeds, duo close ball valve, 2" drain connection in bottom." Id. (citing 15A-4). Second,

Petitioner cites to 15A-6 where it is stated:

> Piping: Soil, waste and vent piping shall be service weight cast iron oil pipe and
> fittings. Vent piping smaller than 2" shall be galvanized wrought steel couplings.
> At Contractor's option, and as approved by the National Plumbing Code,
> drainage, water and vent systems may be properly labeled, Acrylonitrile-
> Butadiene-Styrene, (ABS) Type 1, Grace [sic] 1 or Grade 2 with requirement of
> CS 270 or PVC. Plastic pipe and fittings shall be accompanied with
> manufacturer's certification of type and quality and shall be no less that the
> equivalent of Schedule 36.
>
> Water piping shall be hard drawn type M copper tubing with sweat fittings unless
> noted otherwise.

Id. (citing 15A-6).

Petitioner also references a December 7, 2004 article from the Journal of Philosophy,

Science & Law titled "A Challenge to the Admissibility of Firearms and Toolmark Identification:

8

Amicus Brief Prepared on Behalf of the Defendant in <u>United States v. Kain</u>, Crim. No. 03-573-1

(E.D. PA. 2004)." <u>See</u> Exhibit L to his Supporting Memorandum.

Petitioner also cites to a number of photographs taken by UBA Fire and Explosion. <u>See</u>

Exhibit AA to Supporting Memorandum. In particular, Petitioner cites to photographs numbered

45, 58, 91 and 92 and states:

> Directing the court's attention to photos (45), steel pipe is depicted at left, flexible gas line is attached at this point, supplying gas to water heater. Gas line appears to be pinched shut nearly the entire length. Photo (58), reveals two unknown personnel inside structure, man nearest camera appears to be grasping a section of either 1 ½" or 2" diameter pipe. Photo (91), reveals presence of two pipes attached to the floor joist, pipe located to the right reveals area of damage. Photo (92), parallels (91), photographer's location closer to wall located inside closet, housing water heater. Photo depicts only one of the two pipes mentioned in earlier photo, second area of damage is now visible.

Traverse, p. 5.

Petitioner further cites to a "Supplemental Report" from the Connellsville Police

Department dated January 18, 1999. <u>See</u> Exhibit BB to Traverse. The Supplemental Report

documented interviews with former tenants of the Rose Square Apartments. One tenant had been

asked "if she has ever had any trouble with her furnace in her apartment;" she "stated that she

had a problem with the furnace not coming on in November 1998. She told me that [a]

maintenance worker came and reset the pilot light and the furnace has been fine since." <u>Id</u>.

Another former tenant was asked "if she ever had any problems with the apartment;" she "stated

that she had a problem with a hot water tank about three weeks prior to the fire. She stated that

the pilot light was reactivated and everything has been OK since then." <u>Id</u>. at p. 2.

Petitioner also refers to a document titled "Information relating to the Study and

<u>SCIENCE OF METALLURGY</u> with attached exhibits." <u>See</u> Exhibit CC to Traverse. This

9

document is Petitioner's own analysis of how it was impossible for the pipe fragments found at the Mitts townhouse to have originally constituted a piece of eight (8) inch long pipe nipple. Id., p. 4.

Petitioner also references a 2003 law review article published by the Northern Kentucky Law Review titled "Establishing The Relevance of Expert Testimony Regarding Eyewitness Identification: Comparing Forty Recent Cases With the Psychological Studies." See Exhibit DD to Traverse.

In addition to the above-cited exhibits, as support for his natural gas explosion theory, Petitioner states that: (1) he told Detective Cesario, and defense counsel knew he had told Detective Cesario, that the hot water heater was not operating correctly in the Mitts's townhouse, and that he had been told by his original defense counsel that no complaints concerning maintenance were ever addressed; (2) he told Detective Cesario that he had never heard the furnace operating in the Mitts townhouse, but that Deana Mitts had complained to him of extremely high gas bills; and (3) his former defense counsel, Benita Sumey, told Petitioner that investigators for Mitts's estate had investigated the fire/explosion and concluded that the fire was accidental and that neither the hot water heater or the furnace were in correct operating condition at the time of analysis or testing. Supporting Memorandum, pp. 8-9. Finally, Petitioner contends that had defense counsel properly investigated potassium chloride, a substance found on Deana Mitts' body, they would have discovered it to be defined in Webster's Dictionary as "a crystalline salt KCI occurring as a mineral and in natural water and used esp. as a fertilizer." Traverse, pp. 9-10. When we refer to Petitioner's Supporting Exhibits, we are including these statements as well.

10

### A. Trial counsel's alleged ineffective assistance of counsel.

#### 1. Pre-trial conduct.

We turn first to Petitioner's arguments with respect to trial counsel's alleged ineffectiveness of counsel prior to trial. See Supporting Memorandum, p. 18 (defense counsel was ineffective because they "failed to investigate into original investigators [Trooper Large] findings, and build upon that information.").

##### a. The October 9, 2001 pre-trial hearing on Defendant's Motions to Suppress Evidence and to Conduct Franks Hearings.

Petitioner argues that his trial counsel rendered ineffective assistance of counsel with respect to the October 9, 2001 pre-trial hearing on Defendant's Motions to Suppress Evidence and to Conduct Franks Hearings in that they failed to provide information to the Court that would have attacked the veracity of the statements contained in the affidavit of ATF Special Agent Robert Miller. See Supporting Memorandum, p. 17 (defense counsel failed during a pre-trial hearing in their "duty to provide information to the court for its determination, issue deals with veracity of statements provided in affidavit and submitted to Magistrate Judge Robert C. Mitchell, for issuance of search warrants"); Traverse, pp. 6-7 ("Cross examination [of Special Agent Robert Miller and Connellsville police officer Thomas Cesario at the pre-trial suppression hearing] reveals counsel never reviewed materials provided, or the prosecution never provided defense with Brady material."). Magistrate Judge Mitchell had signed five search warrants in this case based upon the statements contained in Special Agent Miller's affidavit.

The difficulty with Petitioner's contention is that he does not articulate what evidence defense counsel should have introduced at the Franks hearing to attack Special Agent Miller's

11

veracity. Absent such specificity, Petitioner has not established that defense counsel's conduct at the Franks hearing fell below an objective standard of reasonableness or that this conduct by defense counsel prejudiced Petitioner. See Blackledge, 431 U.S.at 74 ("The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal"); Thomas, 221 F.3d at 437 (reiterating that "vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.") (citation omitted); Zettlemoyer, 923 F.2d at 298 (a petitioner "cannot meet his burden to show that counsel made errors so serious that his representation fell below an objective standard of reasonableness based on vague and conclusory allegations that some unspecified and speculative testimony might have established his defense. Rather, he must set forth facts to support his contention.") (citation omitted).

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the contention that defense counsel rendered ineffective assistance of counsel at the October 9, 2001 pre-trial hearing on Defendant's Motions to Suppress Evidence and to Conduct Franks Hearings by failing to attack the veracity of the statements contained in the affidavit of ATF Special Agent Robert Miller.

### b. The April 3, 2002 pre-trial Daubert hearing.

Petitioner also argues that his trial counsel rendered ineffective assistance of counsel in that "[c]ounsel failed [their] duty to perform an effective investigation into [the] field of Tool-Mark and Firearms Identification, counsel's failure to effectively cross examine witness [Greg Klees] would have provided court with necessary information; Petitioner discovered information from the Internet (APPENDIX EXHIBIT: L)." Supporting Memorandum, pp. 16-17. As stated

12

earlier, the document upon which Petitioner is relying to support this contention is from the December 7, 2004 Journal of Philosophy, Science & Law and is titled: A Challenge to the Admissibility of Firearms and Toolmark Identification: Amicus Brief Prepared on Behalf of the Defendant in United States v. Kain, Crim. No. 03-573-1 (E.D. PA. 2004). More specifically, Petitioner argues: "this information would have swayed the court's opinion into the belief, this information is completely unreliable; even in the alternative, the jury needed this information to make its determination as to reliability." Supporting Memorandum, p. 17.

The Government responds that defense counsel should not be found to have been ineffective with respect to their investigation into the field of toolmark and firearms identification or with respect to their cross-examination of the Government's expert witness on toolmark and firearms identification, Greg Klees, because: (1) defense counsel did challenge the admissibility of Mr. Klees's testimony at a pre-trial hearing; (2) Petitioner fails to demonstrate any different ways in which defense counsel could have challenged the admissibility of Mr. Klees's testimony; and (3) Petitioner's reliance on a 2004 article about toolmark and firearms identification is unpersuasive given that the Daubert hearing with respect to the admissibility of Mr. Klees' testimony at Petitioner's trial, and the trial itself, were held in 2002. Government's Response, p. 6. Mr. Klees had testified at a pre-trial Daubert hearing and at trial that the threads of the pipe nipple formed from the fragments of pipe found at the Mitts's townhouse had been cut by a threading machine at the Brillhart Hardware store.

The Kain amicus brief upon which Petitioner relies explained that at issue in the Kain case was the admissibility of the testimony of a firearms and toolmark examiner who would have testified that cuts in a fence and grate were made by the defendant's bolt cutters to the exclusion

13

of all other bolt cutters in the world. Exhibit L to Supporting Memorandum, p. 1. The author of

the amicus brief is Adina Schwartz, J.D., Ph.D. (Philosophy), an associate professor in the

Department of Law, Police Science and Criminal Justice Administration at John Jay College of

Criminal Justice and in the Ph.D. Program in Criminal Justice of The Graduate School and

University Center, City University of New York (CUNY). Id. The Introduction section of the

amicus brief, which was never filed with the Eastern District of Pennsylvania court because the

defendant pled guilty prior to its filing, states its premise as follows:

> The goal of the forensic science discipline of firearms and toolmark identification
> is to identify particular tools, such as a bolt cutter or the barrel of a particular gun,
> as the unique source of marks on crime scene evidence, such as a fence or a fired
> bullet. Although numerous convictions are based on this type of testimony, courts
> have yet to recognize that adequate statistical and empirical foundations have not
> yet been developed for these identifications. The following brief explains the
> systematic scientific problems that should make firearms and toolmark
> identifications inadmissible in court.

Id. (footnotes excluded).

We find that Petitioner has not established that defense counsel's investigation into the

field of toolmark and firearms identification and their cross-examination of the Government's

expert witness, Greg Klees, on this subject matter either fell below an objective standard of

reasonableness or prejudiced Petitioner for the following reasons. First, we agree with the

Government's position that defense counsel cannot be faulted for failing to locate and introduce

into evidence a 2004 article that was not in existence when defense counsel would have been

preparing for the Daubert hearing that occurred in April, 2002 or for cross examination of Mr.

Klees at trial in May 2002. Second, Petitioner has not stated with any specificity what

information contained within the amicus brief should have been introduced at the Daubert

14

hearing and/or at trial and how it would have affected these proceedings. As stated above, conclusory allegations are not sufficient to support a Section 2255 motion. See Blackledge, 431 U.S. at 74; Thomas, 221 F.3d at 437; Zettlemoyer, 923 F.2d at 298. Finally, we find that even if the amicus brief should have been introduced into evidence at the Daubert hearing and the trial, it would not have changed the results of either of the proceedings.

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the contention that defense counsel rendered ineffective assistance of counsel by failing to properly investigate the field of tool mark and firearms identification such that they failed to effectively cross-examine Greg Klees during the pre-trial Daubert hearing and during the trial.

### c. Failure to inquire into the field of metallurgy.

Petitioner also contends that defense counsel rendered ineffective assistance of counsel because they failed to inquire into the field of metallurgy, as he asked them to do. Traverse, p. 5. He contends that had they done so, they would have concluded, as he has concluded, that the original length of pipe nipple could not have originated at the length determined by the ATF, and as indeed, he so informed defense counsel. Id. "Information denoted evidence presented to jury [about length of pipe nipple] being incorrect, since there is a difference of 1 1/8" shorter than determined by ATF agents." Id. at. p. 11.

In support of this position, Petitioner cites to Exhibit CC to Petitioner's Traverse. As set out earlier, Exhibit CC is titled "Information relating to the Study and SCIENCE OF METALLURGY with attached exhibits" and is Petitioner's own analysis of how it was impossible for the pipe fragments found at the Mitts townhouse to have originally constituted a piece of eight (8) inch long pipe nipple. See Exhibit CC to Petitioner's Traverse, p. 4. More

15

specifically, to summarize the exhibit, Petitioner: (1) states "[f]rom my expertize and experience, I believe SAE 1020 grade steel was used in manufacturing process involved with manufacture of pipe;" (2) explains his analysis of the pipe fragments based upon the pipe being made of SAE 1020 grade steel and his observations from reviewing photographs of the pipe fragments; and (3) concludes "[t]hese calculations present proof the original length of nipple could not have originated at the Government's assertion of length being (8) eight inches in length. Id. at pp. 4-7.

Having reviewed Exhibit CC to Petitioner's Traverse, the Court finds that Exhibit CC is nothing more than Petitioner's lay opinion of why the pipe nipple could not have been eight (8) inches long prior to its deflagrating. As such, Petitioner has not established that defense counsel's failure to inquire into the field of metallurgy fell below an objective standard of reasonableness or that defense counsel's failure to inquire in the field of metallurgy prejudiced Petitioner.

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the contention that defense counsel rendered ineffective assistance of counsel because they failed to inquire into the field of metallurgy, as he asked them to do.

## 2. Trial.

Next we turn to Petitioner's arguments with respect to trial counsel's alleged ineffectiveness during the trial.

### a. Concession in opening statement that there was a pipe bomb.

Petitioner contends that trial counsel rendered ineffective assistance of counsel when they conceded during opening statements at trial that a pipe bomb deflagrated as opposed to making the Government prove that there was a pipe bomb. See Supporting Memorandum, pp. 17-18

16

(defense counsel should not have conceded in his opening statement that the explosion and

subsequent fire in Deanna Mitts' townhouse was caused by the detonation of a pipe bomb). In

response, the Government argues:

> The defense strategy in this case was to concede that this crime (which was obvious)
> had occurred, but to argue that the government could not link the defendant to it. In
> an effort to separate the petitioner from this crime, an alibi defense was presented.
> Specifically, trial counsel presented evidence of the petitioner's attendance at a New
> Year's Eve party. In addition, the defense presented evidence that an unidentified
> man had approached the front door to the Mitts's townhouse on the day prior to the
> explosion when Deanna and Kayla were not home.

Government's Response, pp. 9-10.

During the course of the trial, an abundance of testimony was provided by Government

witnesses in support of the Government's theory that Petitioner had placed a pipe bomb and

poured gasoline in the Mitts townhouse and that the pipe bomb had deflagrated, causing the

explosion and fire that killed the Mitts family.  More specifically, ATF Special Agents William

Petraitis and Louis Weiers and ATF forensic chemist Edward Bender testified extensively at trial

on this subject matter as follows.

With respect to the cause and origin of the fire at the townhouse, Special Agent Petraitis,

a certified fire investigator, testified that he arrived at the Mitts townhouse  expecting to find that

a natural gas explosion had occurred (because he had been told that was the initial finding of the

Pennsylvania State Police). Id. at pp. 59-60; 67-68.  However, upon arriving at scene, Special

Agent Petraitis noted there was an unusual amount of fire damage for a natural gas explosion. Id.

at p. 68. He further testified that most natural gas explosions don't have a resultant fire, and that

at this scene there had been a significant resulting fire.  Id.

Special Agent Petraitis further testified that as he walked around the structure, he saw evidence that a fuel air explosion had occurred, but not a natural gas caused fuel air explosion. Id. at pp. 69 and 74. He thought it could be a liquid fuel vapor; gasoline was probably the most reasonable explanation. Id. at p. 74.

Special Agent Petraitis then entered the townhouse. Id. at p. 77. As he did, he did not think it was a pipe bomb that caused the damage; "I felt there was a fuel air explosion, I felt it was probably not natural gas." Id. at p. 78. Ultimately Special Agent Petraitis testified that based upon what he saw once in the townhouse, the number of low burning areas, he concluded, even before submitting any evidence for testing, that that there had been a liquid ignitable pour done in the townhouse. Id. at pp. 93-94. He just did not know what the material was. Id. at p. 94.

Special Agent Petraitis further testified that once he suspected that a liquid accelerant had been used, they brought in an accelerant detection canine, who alerted the agent's team to eight locations in the townhouse. Id. at pp. 87-88. The team took samples from each of the eight locations in order to see if there was residue of an ignitable liquid pour present. Id. at pp. 86-87. Upon testing these samples at an ATF laboratory, one of the eight samples tested positive for gasoline. Id. at p. 147. Special Agent Petraitis explained that it was his experience that if a liquid accelerant is used, they will not always get positive results back from the lab because "quite often it is burned away" and "[c]ertainly the application of water can wash it away." Id. at p. 93.

From the time of his investigation at the townhouse in April, 1999, and continuing through to the trial in May, 2002, it was Special Agent Petraitis's belief that there had been a fuel air explosion, that liquid ignitable vapor had been involved in the fuel explosion, and that it was

18

the thermal effect from the pipe bomb that had ignited the fuel air explosion. Id. at p. 94.

Special Agent Weiers testified that he knew from the first piece of pipe fragment he found in the townhouse, that it was a piece of a fragment from a pipe bomb; he knew this because of "[t]he way that it was fractured, it is not in a straight line, fairly heavy piece of metal. It is not cut by a mechanical operation. So it was burst by some other kind of process." May 1, 2002 Transcript, p. 158. Special Agent Weiers further testified that one of the pieces of pipe found appeared to have a hole drilled into it. Id. at p. 160.

Mr. Bender explained that when making a pipe bomb, a hole, the fuse hole, is drilled in a pipe nipple or an end cap in order to insert the initiator. May 2, 2002 Transcript, p. 95. Mr. Bender further testified that as soon as he saw an end cap fragment come in to his evidence room he opined that it was part of a pipe bomb: "When I looked at that particular item that I didn't believe that that could be in that condition from any other way but to be part of a pipe bomb." Id. at p. 100. Mr. Bender also testified, with respect to the end caps being imbedded in Deana Mitts' hand and abdomen, that "[w]hen there are victims involved, if they are in the proximity to the device, they have a tendency of catching fragments of the device." Id. at p. 104.

Mr. Bender further testified that he went to the Mitts townhouse "looking for indicators, for example, areas that were struck by fragments of the pipe. . . . also looking for maybe there was some wiring, something else, some switches or something else that had been left behind." Id. at p. 104. Mr. Bender testified that based upon what he saw there, he concluded that the damage could not have been done simply by a low energy pipe bomb containing low energy powder; based upon how the walls and stairs were blown out, there had to have been some sort of a fuel air explosion. Id. at pp. 109, 119.

19

Mr. Bender also testified that he could tell where the bomb deflagrated based upon a hole in one of the walls of the living room of the townhouse; he opined that one of the end caps of the pipe hit the wall, bounced off it and exposed the wall to the fire. Id. at pp. 117-118. Mr. Bender actually had that portion of the wall removed, took it to his laboratory and put the end cap found on Deana Mitt's body at the hole in the wall to see if it conformed to the dug-out radius; it did. Id. at 118.

Finally, even the cause and origin expert for the defense, Dr. Gerald Hurst, Ph.D., agreed "that there was some sort of a pipe bomb ignited in this apartment." May 14, 2002 Transcript, p. 109.

In light of this overwhelming testimony with respect to the existence of a pipe bomb in the Mitts's townhouse, we find that Petitioner has failed to demonstrate that trial counsel's concession that there was a pipe bomb during his opening statement fell below an objective standard of reasonableness or that there is a reasonable probability that but for trial counsel conceding during opening statements that there was a pipe bomb, the result of the trial would have been different.

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the contention that defense counsel rendered ineffective assistance of counsel when they conceded during opening statements that there was a pipe bomb.

### b. Need for testimony by expert witness with respect to eye-witness identification.

Petitioner also argues that defense counsel rendered ineffective assistance of counsel by "failing their duty to procure services of an expert in the field of eye-witness identification."

20

Supporting Memorandum, p. 18.

In response, the Government argues:

The petitioner fails to establish, or even explain, how such an expert could have
testified in a way that would undermine confidence in the outcome of this case.
What would such an expert have said in this case? Whose testimony would have
been attacked by this expert? Again, the petitioner makes an unsupported
allegation of ineffectiveness, with no accompanying suggestion as to how it
should have, or could have been done differently or better.

Government's Response, pp. 10-11.

In response to the Government's position, Petitioner attached a 2003 law review article

published by the Northern Kentucky Law Review, "Establishing the Relevance of Expert

Testimony Regarding Eyewitness Identification: Comparing Forty Recent Cases With the

Psychological Studies," to his Traverse and contends:

Literature informs reader that expert testimony is required to educate both court and
jury as to witness recollection of facts, and perception of events. Another topic
discusses duration of time elapsed from event, until retrieval of information and
effects upon memory with outside influences. These are factors which a normal juror
wouldn't know unless they were educated. This information was not only necessary
concerning lay witnesses, but useful during cross-examination of government agents,
relating to chain of events, agents appeared to retain very selective memory.

Traverse, pp. 11-12; Exhibit DD to Traverse.

Petitioner provides absolutely no explanation as to how such testimony from an expert in

the field of eye-witness identification would have changed the results of his trial. As such, we

find that Petitioner has failed to establish a reasonable probability that but for defense counsel's

failure to have an eye witness identification expert testify at trial, the result of the trial would

have been different.

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the
contention that defense counsel rendered ineffective assistance of counsel by failing to procure
the services of an expert in the field of eye-witness identification.

### c. Defense expert witness Dr. Gerald Hurst, Ph.D..

Petitioner also argues that defense counsel provided ineffective assistance of counsel with
respect to the defense's expert witness, Dr. Gerald Hurst. First, Petitioner contends that although
Dr. Hurst was qualified as an origin and cause expert, he then went on to testify as an expert "in
the following fields: forensic chemist, explosives expert and developer, fire examiner, testified
on use and reliability of canines," fields in which he was not an expert, such that his testimony
became unreliable. Supporting Memorandum, p. 19. Second, Petitioner argues "[i]f defense
counsel provided witness with compete file, including all documents and photographs regarding
this case, witnesses review of files would have discovered previously stated evidence, presenting
proof that no crime had ever been committed." Traverse, p. 14 (underlining in original omitted)

Concerning trial counsel's use of Dr. Hurst as their expert in the area of fire and
explosion analysis and Dr. Hurst's reliability as an expert, having reviewed Dr. Hurst's trial
testimony, we find, contrary to Petitioner's argument, that Dr. Hurst's testimony was completely
relevant to his area of expertise, was absolutely reliable and indeed, was most effective in
rebutting the testimony of Special Agent Petraitis and other government witnesses, whose
testimony had been introduced to support the government's position that a liquid accelerant such
as gasoline had been poured in the townhouse prior to the explosion/fire. See May 14, 2001
Transcript, pp. 35-127. Accordingly, we find that Petitioner has not established that defense
counsel's use of Dr. Hurst as an expert fell below an objective standard of reasonableness or

prejudiced him.

Further, to the extent that Petitioner is contending that defense counsel must not have provided Dr. Hurst with the "complete file" because if they had Dr. Hurst would have known and therefore, concluded and so testified that no crime had ever been committed, this contention as to what information defense counsel did and did not provide Dr. Hurst and how Dr. Hurst would have testified, is purely speculative and conclusory. See Blackledge, 431 U.S. at 74; Thomas, 221 F.3d at 437; Zettlemoyer, 923 F.2d at 298. Therefore, Petitioner has not demonstrated that there is a reasonable probability that had Mr. Hurst been provided with additional information, he would have testified that no crime had ever been committed, and the result of the trial would have been different.

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the contention that defense counsel rendered ineffective assistance of counsel with respect to their use of Dr. Hurst as an expert witness.

### d. Cross-examination of Michael Hanley.

Petitioner also argues that his trial counsel provided ineffective assistance of counsel during the cross-examination of ATF auditor Michael Hanley in that defense counsel provided the witness with the wrong formula for determining the "possible number of combinations [that] were obtainable from stores inventory priced at \$3.29 and \$5.59" and "refused to investigate the possibility he erroneously informed both, court and witness as to equation of problem." Supporting Memorandum, p. 20. Thus, Petitioner concludes "[a]lthough witness did not know formulation of equation, witness was correct, determining problem was statistical in nature. Information was completely pertinent concerning reasonable doubt as to purchase from sales

receipt." Id. See also Traverse, p. 10 ("The Movant contends that the articulation between the

recovered sales receipt and purchase of components used to manufacture bomb would have been

eliminated or decreased, if information would have been provided for jury determination."); Id.

("[t]he statistical determination concerning such combinations were necessary to prove such

claim."); Id. ("This number informs the Court that from the store's inventory that 7830 different

combinations of items could be received with a sales receipt identical to one recovered from

Movants home.").

> In response, the Government argues:

> In connection with this claim, however, the petitioner cannot demonstrate that such a
> number could be calculated.  For instance, one would have to consider the various
> types of items at those prices, the chances of those being related to each other in a
> way that would increase their likelihood of being sold together in such a
> combination, and whether the items in question are "volume sales" items as opposed
> items which are rarely sold.  Thus, it is unlikely that a reliable statistic could be
> calculated for such combinations.

> Even more important, however, is that the petitioner cannot show that, even if such a
> calculation could be done, that such evidence could somehow cast doubt on the
> reliability of the verdict in this case. . . .

Government's Response, pp. 13-14.

Relevant to this issue, the Record shows that Mr. Hanley and others had gone to the

Brillhart Hardware store in Connellsville, Pennsylvania to conduct an inventory of prices of the

plumbing supply items at the store. May 7, 2002 Transcript, p. 66. On direct examination, Mr.

Hanley testified that they had found in the plumbing department 18 items priced at $5.59 and 29

items priced at $3.29. Id. at p. 67. This testimony was relevant because a receipt from Brillhart

Hardware dated November 19, 1998 had been found in the house Petitioner was building and the

24

receipt showed that someone had purchased one item that cost $5.59 and two items that cost

$3.29; it was the government's position at trial that the receipt was for one eight inch by two inch

pipe nipple (which cost $5.59 at Brillhart's) and two pipe end caps (which cost $3.29 each at

Brillhart's).

On cross examination, the following exchange occurred between defense counsel and Mr.

Hanley:

Q: . . . If you have one 5.59 item, or you have 18 5.59 items and 29 3.29 items, you've got a total of how many?

A: You would have 47 items.

Q. No. You'd multiply it, wouldn't you? Or I'm sorry, I asked an imprecise question. Certainly you have 47 items, but how many different -- To know the different combinations, you would multiply them. Isn't that correct?

A. I don't know that.

Q. 18 times 29 would give you the different combinations. Wouldn't it?

A. It would give you a number of. I don't know if that's different combinations, though.

Q. Well, how would you figure the different combinations?

A. That would be a probability in statistics question, I guess, which I'm not sure how you would do that.

Q. All right. And then if you had two 3.29 items, because, you know, this receipt shows that two items were purchased, do you know what the probability in statistics of that turns out to be?

A. No, I don't.

Q. So it's a pretty large number, isn't it?

A. I don't know.

Q. Now in your inventory did you determine how many other categories of items besides plumbing exist at Brillhart's?

A. We did not.

Q. Okay. Did you determine how many items that are not in the plumbing section of Brillhart's sell for either 3.29 or 5.59?

A. We did not.

Q. Did you determine how the cash register system worked?

A. I did not.

Q. Okay. Did you determine whether or not – Well, you did determine Brillhart's has no computerized system. Isn't that correct?

A. I didn't. No.

Q. But you learned that, didn't you?

A. Right. I've seen the receipts and things.

Q. Did you individually check each particular item in inventory in June to see if the right price was on it?

A. I didn't individually check everything in the store, no.

Q. All right. And did you individually check each individual price to see if any wrong stickers were put on items?

A. No, I did not.

Id. at 75-76.

Based upon our review of the trial transcript of defense counsel's cross-examination of

Mr. Hanley, we find that defense counsel most effectively elicited testimony from Mr. Hanley

that created doubt as to the weight that the information on the receipt should be given by the jury.

Therefore, we find that even if defense counsel should have provided Mr. Hanley, during his

26

cross-examination, with the statistical formula argued for by Petitioner, Petitioner has not

established that but for this omission the result of the trial would have been different.

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the

contention that defense counsel rendered ineffective assistance of counsel in his cross-

examination of Michael Hanley.

### e. Questioning of Trooper William Large.

Petitioner also contends that defense counsel provided ineffective assistance of counsel

during their questioning at trial of Trooper William Large in that they did not give him the

opportunity to testify as to his original findings that the explosion and fire were caused by a

natural gas explosion and instead, attempted to discredit him and his conclusions with respect to

the cause of the fire:

> Movant retains required basis to state Trooper Large's original investigation was
> correct, including findings that fire does not appear to be suspicious in nature.
>
> Trooper Large acknowledged this fact, scenes appearance changed from his original
> investigation, performed in January of 1999, and his return with ATF in April 1999.
> Mr. Large never informed court as to how much changes occurred, nor did defense
> counsel or prosecution inquire into the changes. Did Trooper Large ever inform
> court as to section of pipe depicted within photographs released by UBA Fire and
> Explosion? Neither counsel inquired into any of this information during trial. Did
> Trooper Large ever view any of this information during his investigation, or since he
> pr[e]viously made his original investigation. Mr. Large concluded his investigation
> after discovering damaged and leaking gas line, supplying gas to water heater. Mr.
> Large assisted with personnel from gas company discovered damages gas regulator,
> supplying gas to furnace. Investigating personnel concluded overtightened fitting
> resulted with sustained damage. At this point, I would have concluded my
> investigation. How much of structure was disassembled during lapse of four month
> period, until Trooper Large's return in April?

Traverse, pp. 12-13.

27

While Petitioner clearly believes that had his counsel further questioned Trooper Large at trial, Trooper Large's testimony would have shown that the cause of the explosion and fire was an accidental natural gas explosion, this contention is purely conclusory and speculative at best and therefore, we find that Petitioner has not established that defense counsel's failure to question Trooper Large as set forth above either fell below an objective standard of reasonableness. To again quote the Third Circuit court in Zettlemoyer, a petitioner "cannot meet his burden to show that counsel made errors so serious that his representation fell below an objective standard of reasonableness based on vague and conclusory allegations that some unspecified and speculative testimony might have established his defense. Rather, he must set forth facts to support his contention." Zettlemoyer, 923 F.2d at 298 (citation omitted). Indeed, Petitioner's contention as to how Trooper Large would have testified is not supported by the Record; at the trial Trooper Large testified that: (1) at the time of the initial investigation, he had not received training in post blast investigation; (2) by the time of trial, he had trained in post blast investigation; (3) were he able to redo his investigation of the explosion and fire, he would have sifted the area looking for an incinerative device type of bomb and a blast seat; (4) if he had found evidence of a bomb, he would have tried to determine where it was located and whether it had caused damage to the furnace which in turn ignited the natural gas; and (5) he could not now say how the furnace's regulator was damaged, that it was his opinion that there was a fuel air explosion at some point during the incident, and that he could not say with a reasonable degree of certainty what type of fuel was involved in connection with the explosion. May 14, 2002 Transcript, pp. 21-22, 24 and 30.

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the

contention that defense counsel rendered ineffective assistance of counsel with respect to their

questioning of Trooper Large during the trial.

### f. Failure to introduce Exhibits H, I, and AA at trial.

Finally, in his Traverse, Petitioner contends:

"The A.U.S.A. states 'petitioner fails to mention any information which was not
made available to the Court which could have changed the outcome of the trial.'
Movant asserts counsel failed to provide court with copies of Exhibits entered as H, I
and AA. Information included in each exhibit and collectively arranged, reveal no
crime ever occurred. Even with adverse ruling denying Motion to Dismiss the
Indictment, no reasonable trier of fact could convict with properly presented
evidence.

Traverse, pp. 6-7. As stated earlier, it is Petitioner's contention that had his counsel advocated a

natural gas explosion explanation for the events that occurred on January 1, 1999, it would have

been clear that the explosion and subsequent fire that killed the Mitts family was caused by a

natural gas explosion, and not a pipe bomb, that Petitioner was innocent of committing any

crime, and that he would not have been convicted.

As explained earlier, Exhibit H contains blueprints of the Rose Square Apartments where

Ms. Mitts' townhouse was located. Petitioner states that they were provided to him at some point

during his pre-trial custody by Richard Villa, described by Petitioner as a private investigator

employed through the Federal Public Defender's office. Supporting Memorandum, pp. 12-13.

Petitioner contends that they support his natural gas explosion theory because the "[m]echanical

drawing reveals locations of each drain within structure along with water heater. These drawings

reveal the use of 2" diameter pipe inside this structure." Traverse, p. 3 (citing Exhibit H to

Supporting Memorandum).

29

As also explained earlier, Exhibit I contains specifications for the Rose Square

Apartments. Petitioner explains that these specifications also had been provided to him at some

point during his pre-trial custody by defense investigator Villa. Petitioner cites to two sections in

Division 15A of the specifications in support of his natural gas explosion theory. See Traverse,

pp. 3-4 (citing Exhibit I to Supporting Memorandum, Division 15A Plumbing). First, he cites to

15A-4 where it was stated for the "Washing Machine Supply and Drain Unit," to "furnish and

install where shown, 43" above floor, a recessed washing machine connection box, "Guy Gray

WB-200" or approved equal with ½" supply feeds, duo close ball valve, 2" drain connection in

bottom." Id. (citing Exhibit I, Division 15A-4). Second, Petitioner cites to 15A-6:

> Piping: Soil, waste and vent piping shall be service weight cast iron oil pipe and
> fittings. Vent piping smaller than 2" shall be galvanized wrought steel couplings.
> At Contractor's option, and as approved by the National Plumbing Code,
> drainage, water and vent systems may be properly labeled, Acrylonitrile-
> Butadiene-Styrene, (ABS) Type 1, Grace [sic] 1 or Grade 2 with requirement of
> CS 270 or PVC. Plastic pipe and fittings shall be accompanied with
> manufacturer's certification of type and quality and shall be no less that the
> equivalent of Schedule 36.
>
> Water piping shall be hard drawn type M copper tubing with sweat fittings unless
> noted otherwise.

Id. (citing 15A-6).

Finally, as also explained earlier, Exhibit AA contains photographs taken by UBA

Fire and Explosion, which Petitioner explains he received from the Bureau of Alcohol,

Tobacco, Firearms and Explosives pursuant to a request filed under the Freedom of

Information Act and the Pennsylvania Right to Know Law. See Supporting

Memorandum, p. 25; Traverse, p. 4 (citing Exhibit AA to Supporting Memorandum). In

particular, as support for his natural gas explosion theory, Petitioner cites to photographs

numbered 45, 58, 91 and 92 and states:

> Directing the court's attention to photos (45), steel pipe is depicted at left, flexible gas line is attached at this point, supplying gas to water heater. Gas line appears to be pinched shut nearly the entire length. Photo (58), reveals two unknown personnel inside structure, man nearest camera appears to be grasping a section of either 1 ½" or 2" diameter pipe. Photo (91), reveals presence of two pipes attached to the floor joist, pipe located to the right reveals area of damage. Photo (92), parallels (91), photographer's location closer to wall located inside closet, housing water heater. Photo depicts only one of the two pipes mentioned in earlier photo, second area of damage is now visible.

Traverse, p. 5.

Contrary to Petitioner's contention, we find that even if defense counsel should have

introduced Exhibits H, I and AA, or any and all of Petitioner's Supporting Exhibits, at the trial,

Petitioner has failed to establish that there is a reasonable probability that but for trial counsel's

failure to introduce these exhibits, the result of the trial would have been different. This

conclusion is based upon the following. First, as stated with respect to trial counsel not rendering

ineffective assistance of counsel for conceding in opening statements that there was a pipe bomb,

the evidence submitted at trial in support of the existence of a pipe bomb in the Mitts townhouse

was overwhelming. Moreover, while Petitioner suggests otherwise, the evidence he submits in

support of his natural gas explosion theory simply does not negate the existence of the pipe

bomb. For example, Petitioner argues that his Supporting Exhibits show that there was a source

for 2-inch pipe in the townhouse other than a pipe bomb. Even if this is true, the existence of

two-inch pipe in the townhouse does not negate the existence of the fragments of shredded and

twisted black pipe and end caps found in debris from the room where Deana Mitts's body was

located and found stuck on Deana's body, fragments that once pieced together formed an eight-

31

inch by two-inch threaded pipe nipple with a hole drilled into it and two end caps that fit the threaded pipe nipple, evidence which numerous witnesses experienced in the field of explosive devices testified were pieces of a deflagrated pipe bomb.  Similarly, while Petitioner emphasizes that the hot water heater and furnace, and piping related to these gas-supplied devices, were damaged, this damage is consistent with both a natural gas explosion and a pipe bomb deflagrating and igniting gasoline that had been poured in the townhouse.

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the contention that defense counsel rendered ineffective assistance of counsel when they failed to introduce into evidence at trial Exhibits H, I and AA, or any and all of Petitioner's Supporting Exhibits.

### 3. Trial counsel's post-trial conduct.

Petitioner also attacks trial counsel's conduct after the trial was concluded:

Pre-trial motion rulings detrimental to defendant were counsel's obligation to APPEAL, and file Writ of Mandamus.  Failure to follow procedure results with defendant being prejudiced by procedural bar, due to defendant being prejudiced by procedural bar, due to negligence of counsel, not of his own.  Through counsel's deficient representation, defendant suffered non-repairable collateral damage. Information should be addressed during direct appeal, even though trial counsel failed to appeal ruling. Going through the motion of representation is what the Petitioner received.

Supporting Memorandum, p. 21.

With respect to this contention, we find that given Petitioner's failure to elaborate upon which pre-trial rulings should have been appealed, why a Writ of Mandamus should have been filed, and how counsel failed to follow procedural rules such that Petitioner was prejudiced in his appellate rights, this aspect of Petitioner's § 2255 claim is a vague and conclusory allegation and

32

fails to establish how this conduct by trial counsel prejudiced Petitioner. See Blackledge, 431 U.S. at 74; Thomas, 221 F.3d at 437; Zettlemoyer, 923 F.2d at 298.

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the contention that defense counsel rendered ineffective assistance of counsel with respect to the filing of Petitioner's direct appeal.

### 4.    Attorney Kammen's "conflict of interest."

Petitioner also contends that defense attorney Kammen's conduct throughout his involvement in the case constitutes evidence of an actual conflict of interest on the part of defense counsel such that Petitioner's Sixth Amendment rights were violated. See Supporting Memorandum, p. 11-13; Traverse, pp. 1-2 (citing Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708 (1980); U.S. ex rel. Partee v. Lane, 926 F.2d 694 (7th Cir. 1991)). In particular, Petitioner cites to the following conduct by Attorney Kammen as proof that he had a conflict of interest: (1) Attorney Kammen told Petitioner, prior to former counsel withdrawing, that prior counsel's fee was unreasonable; (2) Attorney Kammen told Petitioner that the case could not be presented to the jury as prior retained counsel intended; (3) Attorney Kammen told Petitioner that he was not to tell prior counsel about their conversations; (4) Attorney Kammen ignored relevant evidence that the explosion/fire was accidental because he was focused on the penalty phase of the trial as opposed to the determination of guilt phase of the trial; and (5) Attorney Kammen had working relationship problems with respect to prior retained defense counsel and with the Federal Public Defender prior to her withdrawing as defense counsel in that the other defense counsel knew that Petitioner wanted his defense to the charges to be that the explosion was not caused by a pipe bomb. Id.

33

In Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708 (1980), the first case cited to by Petitioner, the defendant had contended that because his attorneys had also represented his two co-defendants, his counsel had a conflict of interest that violated his Sixth Amendment right to counsel. The Court explained that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate than an actual conflict of interest adversely affected his lawyer's performance." Id. at 348, 1718 (footnote omitted). Moreover, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." Id. at 349-50, 1719 (citations omitted).

Turning to Petitioner's conflict of interest argument, and applying the above stated rule from the Cuyler decision to this case, we find that Petitioner did not raise a conflict of interest objection at trial and has not shown that his counsel actively represented conflicting interests as that term is meant in Cuyler. As such, Petitioner has not established the constitutional predicate for his claim of ineffective assistance based upon his counsel's conflict of interest, and his § 2255 motion cannot be granted on this basis.

Having so held, considering Petitioner's *pro se* status, a fair reading of Petitioner's Supporting Memorandum and Traverse in their totality suggests that the "conflict of interest" to which Petitioner is referring arguably is not the type of "conflict of interest" addressed by the Cuyler Court. Rather, Petitioner seems to be arguing that Attorney Kammen had a "conflict of interest" and thereby, rendered ineffective assistance of counsel, when he defended Petitioner

utilizing a theory (that a pipe bomb had deflagrated in Deana Mitts' townhouse but there was not

evidence to conclude beyond a reasonable doubt that it was Petitioner who had committed the

crime) that conflicted with how Petitioner wanted the case handled (that the explosion and fire

were the result of a natural gas explosion and there never was a pipe bomb). To the extent that

Petitioner is so arguing, we state again, that for all the reasons set forth above with respect to

defense counsel's conceding during opening statements that there was a pipe bomb, Attorney

Kammen's decision not to argue that the explosion and fire was caused by a natural gas

explosion, and instead to take the position that there was a pipe bomb in the townhouse but that

the Government could not prove beyond a reasonable doubt that it was Petitioner who had placed

it there, neither fell below an objective standard of reasonableness nor prejudiced the Petitioner.

The evidence introduced at trial concerning the existence of a pipe bomb in the Mitts' townhouse

simply was overwhelming.

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the

contention that defense counsel Kammen rendered ineffective assistance of counsel because he

had a conflict of interest.

### A.    Appellate counsel's alleged ineffective assistance of counsel.

As stated above, Petitioner also contends that his appellate counsel provided him with

ineffective assistance of counsel. Supporting Memorandum, pp. 22-25; Traverse, pp. 15-17.  In

U.S. v. Cross, 308 F.3d 308 (3d Cir. 2002), the appellate court explained:

> The two-prong standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,
> 80 L.Ed.2d 674 (1984), applies to a defendant's claim that his appellate counsel was
> ineffective. First, the defendant "must show that counsel's representation fell below
> an objective standard of reasonableness." Second, he must show that there is "a
> reasonable probability"—"a probability sufficient to undermine confidence in the

outcome," but less than a preponderance of the evidence—that his appeal would have prevailed had counsel's performance satisfied constitutional requirements.

Id. at 315 (citations and footnote omitted).

### 1. Appellate counsel's refusal of Petitioner's requests to assist in the preparation of the appeal, including getting Petitioner necessary transcripts and case files from trial counsel.

Petitioner's first argument with respect to appellate counsel appears to be that appellate counsel provided ineffective assistance of counsel when he refused Petitioner's requests to assist in the preparation of the appeal, including getting Petitioner necessary transcripts and case files from trial counsel. Supporting Memorandum, p. 23. With respect to this contention, we find that any refusal by appellate counsel of Petitioner's requests to assist in the preparation of his appeal, including not providing Petitioner with transcripts and trial counsel's case file, does not fall below an objective standard of reasonableness on the part of appellate counsel. Moreover, even if appellate counsel should have allowed Petitioner to assist in the preparation of the appeal, including getting him transcripts and trial counsel's case file, Petitioner has failed to establish how said refusal prejudiced him, i.e. he has not established a reasonable probability that his appeal would have prevailed had counsel allowed him to assist in the preparation of the appeal, including getting him transcripts and trial counsel's case file.

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the contention that appellate counsel provided ineffective assistance of counsel when he refused Petitioner's requests to assist in the preparation of the appeal, including getting Petitioner transcripts and case files from trial counsel.

36

**2. Appellate counsel's failure to request a hearing *en banc* after Petitioner's direct appeal was denied.**

Petitioner also seems to be contending in his Supporting Memorandum that appellate counsel provided ineffective assistance of counsel when he failed to request a rehearing *en banc* after Petitioner's direct appeal was denied. See Supporting Memorandum, p. 23. The Federal Rules of Appellate Procedure and the local Third Circuit Rules provide that a petition for a rehearing *en banc* may only be filed if the panel decision is contrary to decisions of the United States Court of Appeals for the Third Circuit or the Supreme Court of the United States, or if the appeal involves a question of exceptional importance. Fed.R.App.P. 35.2(b); 3rd Cir. L.A.R. 35.2. Indeed, 3rd Cir. L.A.R. 35.4 cautions:

> As noted in FRAP 35, en banc hearing or rehearing of appeals is not favored. Counsel have a duty to the court commensurate with that owed their clients to read with attention and observe with restraint the required statement for rehearing en banc set forth in 3d Cir. L.A.R. 35.1. Counsel are reminded that in every case the duty of counsel is fully discharged without filing a petition for rehearing en banc unless the case meets the rigorous requirements of FRAP 35 and 3d Cir. L.A.R. 35.1.

3rd Cir. L.A.R. 35.4.

Petitioner has not established that the panel decision on his direct appeal was contrary to any decision of the United States Court of Appeals for the Third Circuit or the Supreme Court of the United States, or that the appeal involved a question of exceptional importance. As such, we find that Petitioner has neither established that appellate counsel's failure to petition for a rehearing *en banc* fell below an objective standard of reasonableness nor shown a reasonable probability that his appeal would have prevailed had his counsel petitioned for a rehearing *en banc*. See also Stuut v. United States, 2005

37

WL 1389181, *3 (W.D. Mich. 2005) (holding that claim challenging appellate counsel's ineffectiveness for failing to file a petition for rehearing *en banc* and allowing the 90-day time period for filing a writ of certiorari to expire did not raise a cognizable constitutional violation because a defendant "does not have a constitutional right to counsel in pursuing discretionary review of a conviction").

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the contention that appellate counsel provided ineffective assistance of counsel when he did not request a rehearing *en banc* after Petitioner's direct appeal was denied.

### 3. Appellate counsel's failure to obtain trial counsel's case file.

Petitioner also seems to be contending in his Supporting Memorandum that his appellate counsel rendered ineffective assistance of counsel because appellate counsel never obtained trial counsel's case file and that without said file, appellate counsel could not effectively represent Petitioner on his appeal. Supporting Memorandum, p. 25.  Petitioner further argues in his Traverse that without trial counsel's files, appellate counsel could not make an attack of ineffective assistance of counsel by trial counsel and could not argue "actual innocence." Traverse, pp. 15-16.

Even assuming Petitioner's factual allegation to be true and that appellate counsel never obtained trial counsel's case file, Petitioner has not established what documents were not seen by appellate counsel as a result of appellate counsel's not obtaining trial counsel's case file and how these documents which would have made a difference to Petitioner's appeal.  Therefore, Petitioner has not established that there is a reasonable probability that but appellate counsel's failure to obtain trial counsel's case file, his direct appeal would have been successful.

38

Moreover, when filing a direct appeal in a criminal case, appellate counsel does not need trial counsel's entire case file; rather, he only needs those documents that are part of the official record. See Johnson v. U.S., 2010 WL 1252674, *6 (W.D.N.C.) (explaining "appellate claims are limited to claims based upon the record"). Here, Petitioner's own evidence establishes that appellate counsel had in his possession the transcripts from the various pre-trial and post-trial hearings, jury selection, and the trial itself, and had reviewed the court record, including sealed documents. See Exhibit U to Supporting Memorandum (appellate counsel's "Response to Appellant's Motion to Proceed Pro Se and to Government's Response" which was filed with Third Circuit court) and Exhibit Z to Supporting Memorandum (Petitioner's Record of Documents forwarded to Earl Minerd, Petitioner's brother, on behalf of Petitioner from appellate counsel).

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the contention that appellate counsel provided ineffective assistance of counsel because he never obtained trial counsel's case file and that without said file, appellate counsel could not effectively represent Petitioner on his appeal.

### 4. Appellate counsel's choice of issues to appeal.

In his Traverse, Minerd also appears to be arguing that appellate counsel rendered ineffective assistance of counsel by appealing this Court's finding that the interstate commerce element needed for an indictment under 18 U.S.C. § 844 was present in this case and by appealing that the evidence introduced at trial was insufficient to support the verdict against Petitioner, when the issue appellate counsel should have raised on appeal was that that the verdict was against the weight of the evidence because Petitioner was innocent. Traverse, pp. 15-16.

39

"Trained appellate counsel knows to appeal issues containing merit." Id. at p. 15. See also Id. at
p. 17 ("The most important claim to address would include an "Actual Innocence Claim'.").

With respect to the issues appellate counsel did raise on appeal, appellate counsel
obviously made a tactical decision to pursue on appeal the arguments which, in his professional
judgment, he deemed to have the greatest chance for success, and this Court will not second-
guess that decision. Even assuming, however, that appellate counsel should not have raised the
issues he did on appeal, Petitioner has not shown that there is a reasonable probability that his
appeal would have prevailed had counsel not raised the issues he did.

Turning to Petitioner's contention that appellate counsel should have argued on appeal
that the verdict was against the weight of the evidence because Petitioner actually was innocent,
we find that Petitioner has not established that had appellate counsel so argued, the result of his
appeal would have been successful. As repeatedly stated in this Opinion, the evidence introduced
at trial established beyond a reasonable doubt that there was a pipe bomb in the Mitts' townhouse
which deflagrated causing an explosion and fire that killed the Mitts family. We need not revisit
said evidence again. Further, the evidence introduced at trial also proved beyond a reasonable
doubt that it was Petitioner who had placed the pipe bomb in the townhouse. As stated by the
appellate court in its opinion on Petitioner's direct appeal:

At trial, the government presented evidence, including testimony by two expert
witnesses, that the pipe used in the pipe bomb had been threaded at Brillhart's
Hardware Store. The bomb was a two-inch by eight-inch pipe that include two end
caps and one eight-inch long pipe [nipple]. While searching Minerd's residence, the
government discovered a receipt from the plumbing department of Brillhart's
Hardware Store which reflected the purchase of two unspecified items priced at $3.29
each, and one items priced at $5.59. The government also found that Brillhart's sold
end caps identical to those used in the pipe bomb for $3.29 each. Thus, the jury could
easily have reasoned that the receipt found in Minerd's home linked him to the sale

40

of the eight-inch pipe bomb and its two end caps.  . . .   Moreover, that is not the only link that binds Minerd to the fatal fire bomb.

Minerd was a skilled machinist . . . and the government also presented evidence that two of Minerd's neighbors had heard of explosions coming from his property in the months preceding Deanna Mitts' death. Lastly, the jury learned that four cans of gunpowder, consistent with the type of gunpowder used in pipe bombs, were found in Minerd's home.

The government also presented evidence strongly suggesting motive and opportunity for Minerd's actions. Minerd admitted to a police officer that he wanted Deana Mitts to have an abortion and that she had refused. Minerd told the officer that he believed that Deana Mitts was carrying someone else's child. In addition, the government presented evidence that Minerd had repeatedly driven by Deana Mitts' apartment and her parents' home, and had followed her home from church on multiple occasions. The jury also heard testimony from neighbors who had seen Minerd shove Deana Mitts, as well as testimony from Deana Mitts' mother, who testified that she had seen bruises on Deana's neck. Lastly, one of Minerd's co-workers testified that Minerd tried to get a stun gun repaired, commenting that he wanted to shock Deana Mitts into a miscarriage.

Minerd's whereabouts were unaccounted for between 2:30 a.m. and 8: 40 a.m. on the day Deana Mitts was killed. The jury learned that during this time frame, Deana Mitts was staying at her parents' house and her car was visibly parked at their house. The jury also learned that Minerd had a key to Deana Mitt's apartment.

U.S. v. Minerd, 112 Fed. Appx. 841, 844-845 (3rd Cir. 2004) (citations to Appendices omitted).

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the contention that appellate counsel rendered ineffective assistance of counsel by appealing our finding that the interstate commerce element needed for an indictment under 18 U.S.C. § 844 was present in this case, by appealing that the evidence introduced at trial was insufficient to support the verdict against Petitioner, and by not appealing on the basis that the verdict was against the weight of the evidence because Petitioner was actually innocent.

**5. Appellate counsel's failure to argue on direct appeal that trial counsel was ineffective.**

Finally, Petitioner appears to be arguing in his Traverse that appellate counsel provided ineffective assistance of counsel by not arguing on direct appeal that trial counsel was ineffective. Traverse, pp. 15-16.

As recently explained by the Third Circuit Court in an unpublished decision:

"[w]e have repeatedly expressed our strong preference for reviewing allegations of ineffective assistance of counsel in collateral proceedings under 28 U.S.C. § 2255 rather than on direct appeal." [There is a] "narrow exception" applicable "[w]here the record is sufficient to allow determination of ineffective assistance of counsel.

U.S. v. Hobbs, 2011 WL 5149153, *2 (3d Cir. Nov. 1, 2011) (citations omitted). Petitioner has not established that the record was sufficient to allow determination of his claims of ineffective assistance of counsel on direct appeal. Additionally, a review of the docket in Petitioner's direct appeal indicates that on February 2, 2004, the appellate court entered an Order in which it held that claims of ineffective assistance of counsel are generally not reviewable on direct appeal. Therefore, we find that appellate counsel's decision not to raise the issue of ineffective assistance of trial counsel on direct appeal did not fall below an objective standard of reasonableness.

Moreover, Petitioner has not established that any failure on appellate counsel to raise the ineffective assistance of trial counsel on direct appeal prejudiced Petitioner. This is not surprising, of course, because for all of the above stated reasons, we have found that trial counsel did not render ineffective assistance of counsel.

Petitioner's Section 2255 Motion is denied to the extent it is premised upon the contention that appellate counsel rendered ineffective assistance of counsel by not arguing on direct appeal that trial counsel was ineffective.

## V. Certificate of Appealability.

The remaining issue before this Court is whether a certificate of appealability ("COA")

should be issued with respect to Petitioner's § 2255 motion.  A court should issue a certificate of

appealability where a petitioner makes a "substantial showing of the denial of a constitutional

right." 28 U.S.C. § 2253(c)(2).  A petitioner meets this burden by showing that "reasonable jurists

would find the district court's assessment of the constitutional claims debatable or wrong." Slack

v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595 (2000).  We find that that for the reasons set

forth above, Petitioner has not made a substantial showing of the denial of a constitutional right.

Therefore, a certificate of appealability should not issue.

## VI. Conclusion.

Petitioner Joseph P. Minerd's *pro se* "Motion Under 28 U.S.C. to Vacate, Set Aside or

Correct Sentence by a Person in Federal Custody" will be denied.  A certificate of appealability

will not be issued.  An appropriate Order follows.

March 29, 2012

Maurice B. Cohill, Jr.
Senior District Court Judge

43